# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBIE JO JACOBSEN | ) | |
| | ) | |
| | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:16-CV-1608-KOB |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On October 3, 2012, the claimant protectively applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. The claimant alleged disability beginning March 15, 2011, because of migraines, arthritis in her neck and back, fibromyalgia, blindness in her left eye, and vascular problems. The Commissioner denied these claims on

December 27, 2012.  On February 1, 2013, the claimant filed a written request for a hearing before an Administrative Law Judge, and he held a hearing on July 16, 2014.  The ALJ held a second hearing on February 20, 2015 to hear additional medical testimony.  (R. 23, 50-63, 65-87, 127, 132, 206, 214, 231, 234).

In a decision dated August 2, 2015, the ALJ found the claimant not disabled as defined by the Social Security Act and, therefore, ineligible for disability benefits. (R. 23-37).  On July 28, 2016, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 104).  The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the court REVERSES and REMANDS the decision of the ALJ because substantial evidence does not support his findings regarding the claimant's fibromyalgia.

## II. ISSUE PRESENTED

Whether the ALJ's finding that the claimant did not have the medically determinable impairment of fibromyalgia lacks substantial evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g);

*Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.1987).

"No . . . presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims*." Walker*, 826 F.2d at 999. This court does not review the ALJ's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to

disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [ALJ]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The Eleventh Circuit has recognized that "fibromyalgia, a chronic pain illness, is usually diagnosed based on an individual's described symptoms because the 'hallmark' of the disease is a lack of objective evidence." *Brown-Gaudet-Evans v. Comm'r Soc. Sec.*, 673 F. App'x 902, 906 (11th Cir. 2016). The ALJ must "find that a person has a [medically determinable impairment] of [fibromyalgia] if the physician diagnosed [fibromyalgia] and provides the evidence described in II.A or section II.B, and the physician's diagnosis is not inconsistent with the other evidence in the [claimant's] case record." SSR 12-2p.

Sections II.A and II.B provide two sets of criteria for diagnosing fibromyalgia: the 1990 American College of Rheumatology (ACR) Criteria for the

Classification of Fibromyalgia *or* the 2010 ACR Preliminary Diagnostic Criteria.

SSR 12-2p §§ II.A & II.B.  The 1990 ACR Criteria requires that the claimant show

(1) a history of widespread pain; (2) at least 11 positive tender points on physical

examination, found bilaterally, on the left and right sides of the body and both

above and below the waist; and (3) evidence that other disorders that could cause

the symptoms or signs were excluded.  SSR 12-2p § II.A.  In testing the tender-

point sites, "the physician should perform digital palpation with an approximate

force of 9 pounds (approximately the amount of pressure needed to blanch the

thumbnail of the examiner)."  *Id*. at II.A.2.b.

The 2010 ACR Criteria requires that the claimant demonstrate (1) a history

of widespread pain; (2) repeated manifestations of six or more fibromyalgia

symptoms, signs, or co-concurring conditions; and (3) evidence that other

disorders that could cause the symptoms, signs, or co-concurring conditions were

excluded.  SSR 12-2p § II.B.  Symptoms and signs of fibromyalgia include muscle

pain, fatigue or tiredness, muscle weakness, headache, numbness or tingling,

dizziness, insomnia, depression, nausea, chest pain, shortness of breath, and hair

loss.  *See* SSR 12-2p § II.B n. 9 (citing 20 C.F.R. 404.1528(b) and 416.928(b) and

Table No. 4, "Fibromyalgia diagnostic criteria," 2010 ACR Preliminary Diagnostic

Criteria).  Some co-occurring conditions include depression, chronic fatigue

syndrome, gastroesophageal reflux disorder, and migraines. SSR 12-2p § II.B n. 10.

If an ALJ finds insufficient evidence to determine whether a claimant has a MDI of fibromyalgia, he "may recontact the person's treating or other source(s) to see if the information [the ALJ] need[s] is available" or order a consultative examination to determine if the claimant has a MDI of fibromyalgia when he needs that information to adjudicate the claim. SSR 12-2p III.C.1 & 2.

## V. FACTS

The claimant was forty-three years old at the time of the ALJ's final decision. The claimant has an 8th grade education and past relevant work as a cashier, housekeeper, and dry cleaning presser. (R. 235-36). The claimant alleged disability beginning on March 15, 2011 because of migraines, arthritis in her neck and back, fibromyalgia, blindness in her left eye, and vascular problems. (R. 23, 234).

### Physical Limitations

In March 2010, the claimant complained of arm and leg pain and fatigue to doctors at Baptist Shelby Emergency Department. On March 9, 2010, the claimant saw Dr. David Cox at Cardiovascular Associates for "unpredictable episodes of chest pain," "whole body tingling," and fatigue. Dr. Cox indicated at the March 23, 2010 follow-up that the claimant's stress test and echocardiogram

were normal and that her chest pains were "noncardiac." At that follow-up, the claimant reported chest pains the Friday before; continued fatigue; and dizziness. (R. 316, 346-49).

The claimant sought treatment on June 30, 2010 with Dr. Kirschberg at Southern Neurology for a "very severe group of headaches that started in the last four or five months." Dr. Kirschberg noted that the claimant has no medical insurance; she went to Shelby Baptist Emergency Department in May 2010 for one of her severe headaches, but a CT scan of the brain and spinal tap were normal; and the doctor at Shelby Baptist prescribed the claimant Fiorcit and Compazine, but she continued to have three or four severe headaches a week. The claimant reported that her hands and tongue go numb during a migraine; she cannot tolerate the Fioicit; and she uses the Compazine that helps relieve her nausea. Dr. Kirschberg noted that his physical examine revealed blindness in the claimant's left eye, which she had for fifteen years as the result of an accident, but all of her other systems appeared normal. He prescribed Anaprox for her migraines; ordered a head angiogram; and asked the claimant to follow-up the next month. (R. 339-40).

At her follow-up on July 15, 2010, the claimant reported to Dr. Kirschberg that her "headaches are no better on Anaprox" and that it causes swelling. Dr.

Kirschberg "put her on a little Elavil today"; told her to take Mobic; and asked her to follow up by phone in two to four weeks. (R. 335).

By November 19, 2010, the claimant reported to Dr. Kirschberg that she could not tolerate the Elavil and that the Mobic was not helping. Dr. Kirschberg gave the claimant three-week's worth of samples of Savella, "the newest of the SNRIs for chronic pain"; continued the claimant on the Mobic; and asked her to follow-up by phone in the next couple weeks. (R. 334). The record contains no additional medical records from Dr. Kirschberg after November 2010.

The claimant presented to Dr. Jonathan C. Merkle at Montevallo Family Medicine on March 10, 2011, complaining of fatigue and sinus issues. Dr. Merkle noted "Fibromyalgia/Fatigue" under his "Assessment/Plan." (R. 359).

On March 28, 2011, the claimant returned to Dr. Cox at Cardiovascular Associates, again complaining of worsening chest pains, fatigue, dizziness, and leg pain. The claimant also wanted to discuss taking Chantix to stop smoking. Dr. Cox noted that "[o]verall, she's doing well, but questions in a general way why she's so tired all the time. I don't have an explanation for this from a cardiac standpoint."

Between June 9, 2011 and September 22, 2011, the claimant sought treatment at the Community of Hope Health Clinic on four occasions. During those visits, the claimant reported chronic pain "all over" her joints, especially her

left leg and hip; fatigue; dizziness; no energy; hair loss for the previous six to seven months; muscle weakness; poor sleep; and shortness of breath. Her range of motion in her neck and shoulders were normal during these visits. On June 16, 2011, the doctor at Hope Health Clinic indicated the difficulty with diagnosing her chronic pain, and listed "fibromyalgia?" as a possible cause. (R. 390-93, 397, 407).

The claimant returned to the Hope Health Clinic on March 12, 2012, complaining of heartburn and neck and head pain on her left side. The claimant reported that she has three to four headaches a week; has suffered severe headaches for ten years; experiences tingling in her legs during the headaches; and gets "some" relief with Tylenol. The doctor ordered a CT scan of her cervical spine that produced normal results. She also reported heartburn; the doctor assessed gastroesophageal reflux disease (GERD) and prescribed Omeprazole. At her follow-up on March 19, 2012, she had limited range of motion in her neck and left shoulder and tenderness, and the doctor prescribed cyclobenzaprine as a muscle relaxer. (R. 387-88, 375, 404).

At a follow-up at Hope Health Clinic on April 9, 2012, Dr. William Dunham treated the claimant, who complained of neck pain on her right side and lack of muscle function and coordination on her right and left sides. Dr. Dunham's physical examination of the claimant revealed a positive Spurling's Test possibly

because of a herniated disc in the cervical spine. An MRI performed on April 16, 2012 revealed minimal right posterolateral disc protrusion and uncovertebral joint hypertrophy at C6-C7, but no stenosis or nerve root encroachment. At the follow-up on June 4, 2012, Dr. Dunham diagnosed the claimant with degenerative joint disease of cervical spine at the right facet joint. (R. 376, 386).

The claimant returned to Dr. Dunham on October 8, 2012, complaining of weakness and tingling in her right hand. He ordered a nerve conduction study that showed no definite abnormality. Dr. Nasrollah Eslami, who conducted the study, indicated that, although the nerve conduction test on the claimant was normal, he assessed she had mild carpal tunnel syndrome in her right hand based on her history and his clinical exam. Dr. Dunham noted the claimant weighed 210 pounds and needed to diet and exercise. (R. 385, 416, 462-63).

At the request of the Disability Determination Service, the claimant completed a "Function Report-Adult" on October 25, 2012. In that report, the claimant stated that, on a typical day, she watches TV, plays easy Wii games, moves around the house, lies down during the day, and goes to bed at night. Sometimes at night, her neck and back hurt so bad that she wakes up, often with a headache. When bathing, she has to sit on the side of the tub to take a shower because she cannot stand for too long or her back hurts; to wash her hair, she sits on a chair, leans over the tub, and uses a cup to rinse her hair. She prepares meals

such as salads, crock pot meals, or frozen dinners once a day; she used to make homemade meals before her pain limited her activities.  She used to be able to do laundry, vacuum, make the beds, clean the bathrooms, and wash dishes; but, because of her impairments, now can only dust for about fifteen minutes with a feather duster once every two weeks.

The claimant testified that she can drive, but she only goes out when necessary, like for appointments with her doctors.   She shops for groceries once a week for about thirty minutes; pays bills; can count change; and can handle a savings and checking account.  However, she stated that her impairments limit her ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, concentrate, and understand some things.  She can walk about 50 to 100 feet before she has to stop for about ten to fifteen minutes and rest.  She can pay attention a few minutes; follow instructions with no problems; gets along "fine" with authority figures; and does not handle stress or changes in routine well.  (R. 245-55).

The claimant also complete a "Headache Questionnaire" on October 25, 2012, in which she stated she has three to four headaches a week that feel like a "sledge hammer" has gone through one side of her head. The headaches usually last for an hour and a half, and she has had these headaches for ten to twelve years. Her headaches cause sensitivity to light and noise; her hands are numb and "tingly"; and she slurs her words.  She stated that she has tried to take prescription

medications for the migraines, but she is allergic to them; those medications cause her to throw up, break out, and have suicidal thoughts. She stated she went to Shelby Medical Center for her migraines, but doctors referred her to a neurologist. (R. 257-59).

At the request of the Social Security Administration, neurologist Dr. Ashely Holdridge, with MDSI Physician Services out of Ogden, Utah, performed a consultative examination of the claimant on December 8, 2012. Dr. Holdridge also reviewed the claimant's medical records. The claimant told Dr. Holdridge that more than ten years ago she started having migraine headaches. She has three or four migraines per week that sometimes last all day and feel like a "sledge hammer" going through the left side of her head. During her headaches, she is sensitive to light and sound and has nausea. Taking three to four Bayer Aspirin a day and sleeping give her some relief. The claimant has tried multiple migraine medications prescribed by her neurologist, but she cannot tolerate any of those medications.

Regarding her fibromyalgia, the claimant told Dr. Holdridge that "she was diagnosed [with fibromyalgia] two years ago by her neurologist." She has aching pains "all over," but worse in her shoulders and back. Lying down with a heating pad and taking Bayer Aspirin give her some relief. The claimant also reported to Dr. Holdridge that she went completely blind in her left eye in 2000 after a bungee

cord pierced that eye three times.  She also stated that she has neck pain with throbbing and sometimes shooting pains down her neck and right arm.  Her neck pain increases when she turns her head, and she uses heating pads to relax her muscles.

When asked about her activities of daily living, the claimant reported to Dr. Holdridge that she can do them on her own, but sometimes needs help with putting on her shoes and socks because she "aches so bad."  She can shower on her own; cannot do dishes or cook so her husband does those chores; tries to dust a "little bit"; and spends the majority of her day watching TV and lying down.

Dr. Holdridge noted that the claimant could walk into the examination room and get on the table without difficulty, but she had a "significant amount of pain lying flat on the table and getting up," causing the claimant to "start crying in pain."  She could open and close a safety pin and pick it up off a flat surface with both hands.  Dr. Holdridge noted that the claimant was 5'6" and weighed 161 pounds.

Dr. Holdridge's physical examination of the claimant revealed that she has a "slight left sided limp. She was unable to tandem walk, to walk on her toes or walk on her heels, because she said she was in too much pain" and began to cry.  She could not squat because of her pain.  Her range of motion in all areas was normal, but she had "multiple areas of tenderness to palpation and she did have at least 12

of the typical fibromyalgia trigger points." Dr. Holdridge noted that the claimant became "extremely tearful after she went from a supine to a sitting position and after the trigger points for fibromyalgia were tested." She had 5/5 muscle strength; normal sensation to touch and pin in her fingers on both hands; total loss of pinprick sensation in her left leg; and normal sensation in her left arm and right leg and arm.

Dr. Holdrige's diagnoses included migraine headaches, fibromyalgia with "typical trigger point[s] associated with fibromyalgia"; blindness in her left eye; and neck pain most likely caused by osteoarthritis. (R. 444-48).

The claimant returned to Dr. Dunham for a follow-up on January 14, 2013 complaining of sudden severe pain in her left leg; muscle spasms; motor weakness; and neuropathy. Dr. Durham ordered an MRI of her lumbar spine that showed normal results and "no abnormality to explain the [claimant's] symptoms." (R. 459, 461, 481-82).

On June 19, 2013, the claimant began treatment with Dr. Larry S. Mikul at Baptist Health Center. The claimant told Dr. Mikul that her lower back pain was worsening and radiating to her left thigh. She described the pain as "burning and tingling" and stated that sitting, standing, and walking aggravate the pain. She has weakness in her left leg even when taking a shower; has swelling in her ankles; and cannot sleep at night because of her pain. She also reported having mild symptoms

of loneliness and depression; crying spells for no reason; and two to three headaches a week. Dr. Mikul's notes indicate that the claimant is allergic to Acetaminophen, Hydrocodone, Cephalexin Monohydrate, Sulfa antibiotics, Pseudoephedrine, Terbinafine, Hydroxyzine, Loratadine, Doxycycline, Clarithromycin, Tramadol, Ketoprofen, and Hydromorphone.

Dr. Mikal's physical examination of the claimant showed a full range of motion in her spine and hip. However, he found that her "Fibromyalgia Tender Point Calculation" was "12." He assessed that the claimant has "Fibromyalgia syndrome," depression, and sciatica neuralgia, and prescribed Diclofenac Sodium for her migraines; Soxepin for her depression, anxiety, and insomnia; Flexeril as a muscle relaxer; Motrin for her inflammation and pain; Neurontin for nerve pain; and Omeprazole for her GERD. (R. 478-80).

The claimant saw Dr. Mikal again on June 27, July 8, July 17, and December 13, 2013. During those visits, the claimant reported "mildly severe" shortness of breath aggravated by activities of daily living; joint tenderness, pain, and swelling; knee pain; fatigue and malaise; generalized weakness; decreased mobility; and weight loss. During the July 8 visit, Dr. Mikal found normal range of motion, muscle strength, and stability in her extremities with no pain on inspection, and the claimant reported on July 17 that the Neurontin caused swelling, but that it and the Naproxin "has helped." Dr. Mikal's notes on July 17

indicate the claimant's "gerd, depression, and fibromyalgia are all better. She is now using a cane. She requested a handicap sticker." He suggested that the claimant see a rheumatologist. (R. 466-68, 471-74, 491-93).

The claimant saw Dr. Mikul again on April 16, July 8, and July 15, 2014, continuing to complain of chronic pain and worsening left leg pain aggravated by lying down, sitting, or standing. In April, she indicated she did not feel fatigued, but by the July 8th visit she reported fatigue, chest pains, swelling, and irregular heartbeats. Dr. Mikul added prescriptions for Cymbalta for her fibromyalgia pain and Mirapex for muscle control. (R. 486-88, 561-65).

At the request of Disability Determination Service, Dr. Rex Harris, an orthopedic surgeon, performed a consultative examination of the claimant without reviewing her medical records. The claimant reported to Dr. Harris that she has fibromyalgia, left leg pain, left neck pain, carpal tunnel syndrome in her right hand, and sciatica on her left side. Dr. Harris' physical examination of the claimant revealed that she has a full range of motion in all areas, except she had limited flexion and extension in her dorsolumbar spine; had a 4/5 grip strength on both her right and left hands; minimal tenderness in her lower back; and negative straight leg tests.

Based on the claimant's complaints and his physical examination of her, Dr. Harris assessed that the claimant could occasionally lift and carry up to 10 pounds;

sit for twenty minutes at one time; stand for fifteen minutes at one time; walk for fifteen minutes before needing a break; required a cane to ambulate because it was "medically necessary"; could occasionally reach overhead, handle, finger, feel, and push/pull; occasionally operate foot controls; never work around unprotected heights, moving mechanical parts; can occasionally drive; and can occasionally work around extreme cold, heat, humidity, dust, and odors. In his opinion, the claimant is "capable of sedentary work in the work place." (R. 502-12).

The claimant returned to Dr. Mikul on August 14, November 13, and December 2, 2014. At the August visit, she complained of lower back pain, tingling down her leg, and swelling in her feet. After her November 13 visit with Dr. Mikul, she presented to the Emergency Department at Shelby Baptist Medical Center on November 23, complaining of back pain, leg pain and swelling and chest pains. A Doppler exam revealed a blood clot in her left leg, and Dr. Derek Patterson prescribed Xarleto and discharged the claimant to follow-up with Dr. Mikul.

By her December 2, 2014 follow-up visit with Dr. Mikul, the blood clot was still in her left leg, and she continued to complain of back pain, joint pain, fatigue, and malaise. Dr. Mikul added a prescription for Percocet for pain. (R. 537-39, 541, 546, 556-60).

At a January 26, 2015 follow-up visit, Dr. Mikul noted that the claimant needs more activity to help with the blood clot in her left leg and that he encouraged her to quit smoking. His notes state that "[a]s explained and as indicated by multiple signs around the office, I do not make disability determinations. She has left a form for me to complete and I have completed the section that states she can work." (R. 573).

*First ALJ Hearing*

After the Commissioner denied the claimant's request for disability benefits, the claimant requested and received a hearing before an ALJ on July 16, 2014. (R. 8-39). At that hearing, the claimant testified that she stopped working in 2009 because she could not perform the required duties. She explained that she worked at a gas station and was fired because she did not see someone steal gas without paying. The gas pumps were on her left side when she stood at the cash register, and her blindness in her left eye prevented her from seeing the gas pumps. (R. 70).

She also testified about the limitations caused by her fibromyalgia pain. She hurts all over "mostly every day" and has a "prickly tingling feeling" in her shoulders and arms. She stated that her doctor put her on Cymbalta a month earlier that helps a little because "it takes a little [of the pain] away." The ALJ asked: "How did the doctors test you for fibromyalgia; she responded: "They didn't. They asked me what I felt, and I told them. I explained to them everything I was

feeling." The ALJ asked the claimant to "tell [him] where your trigger spots are." She described spots in her back, leg, and shoulder that are tender. The ALJ asked her if she had any additional tender spots, and she responded: "No." (R. 71).

The claimant testified she has had her migraines since she was a kid, but they have worsened and become more frequent as she has aged. She said she saw Dr. Kirschberg at Southern Neurology for her migraines; he prescribed several migraine medications to which she was allergic. She has three to four migraines a week that could last from three to eight hours; has to lie down and put rags over her eyes; feels nauseas during the migraines; and takes Excedrin Migraine to help with the pain. (R. 72-73).

She also suffers from sciatica pain in her left leg that feels like "getting a lot of needles poked at you." She testified that she has fallen down steps three times because her leg hurts, and she cannot put pressure on it. She obtained a disability parking permit because of her sciatica, and she cannot walk 200 feet without having to stop and rest. She testified that she also has back pain and arthritis; weakness in her right arm; and carpel tunnel syndrome in her right hand that shoots pain up her arm and causes numbness in her fingertips. (R. 74-79).

Regarding her daily activities, the claimant testified that she does not go grocery shopping; has no activities or hobbies outside of her home; and does not attend church. She dusts, but her husband does the laundry and dishes. (R. 80).

The vocational expert Claude Peacock testified that the claimant has past relevant work as a cashier, housekeeper, and presser at a dry cleaner, all classified as light, unskilled work. Mr. Peacock then testified concerning the type and availability of jobs that the claimant was able to perform. The ALJ asked Mr. Peacock about an hypothetical person the same age, education, and work history as the claimant, who could perform a full range of light work, except she could only occasionally stoop, kneel, crouch, crawl, and climb stairs and ramps; cannot work at unprotected heights or around moving equipment; cannot climb ladders, ropes, or scaffolds; and can frequently use her hands bilaterally to finger and grasp. Mr. Peacock testified that such an individual could return to the claimant's past relevant work. (R. 83).

Mr. Peacock stated that, if the hypothetical person had pain such that she could not maintain persistence and pace for 15-20% of the workday, no work would be available.

*Second ALJ Hearing*

The ALJ convened a second hearing for Dr. Irving Kushner, a board-certified rheumatologist, to testify via telephone regarding "whether sufficient medical evidence [exists] in the record to form an opinion of the claimant's medical status." Dr. Kushner reviewed the claimant's medical records and testified that he was "puzzled as to why a rheumatologist is needed for this case because I

didn't find very much rheumatologic here."  Dr. Kushner stated that he "might say that [he's] not qualified to give an opinion about transient neuropathy or traumatic eye blindness," but in his opinion none of the non-rheumatologic diagnoses he found in the claimant's record would meet or equal a Listing.

The ALJ then asked Dr. Kushner about the claimant's fibromyalgia.  Dr. Kushner acknowledged the mention of fibromyalgia in the claimant's medical records, but stated that "about half the rheumatologists don't really think there is such a thing.  I've been skeptical.  I don't really think it's a medically determinable condition."  (R. 52-56).

Dr. Kushner testified that, even though he does not believe fibromyalgia is a medically determinable impairment, he acknowledged that the Social Security Administration issued a ruling "telling us that fibromyalgia is a medically determinable condition and giving us criteria to arrive at a conclusion."  He described the requirements for the 1990 and 2010 ACR Criteria.  Dr. Kushner noted that the first requirement under both sets of criteria is that the claimant has "widespread pain . . . in all quadrants of the body" that persists for at least three months.  He found that the claimant's medical record contains "no description of the claimant's pain at that distribution anywhere in the record."  Dr. Kushner also indicated that he did not "see any numbers in this record" regarding the number of tender point sites for the claimant.  He stated that he has "no idea what sort of

pressure was being applied for that physician to conclude that [there] were tender points.  So . . . it doesn't meet the criteria in that ruling."  (R. 56-57).

Based on his review of the claimant's medical file, Dr. Kushner concluded that the claimant has "no medically determinable conditions that would lead to limitation," even taking her blood clot in her leg into consideration.  Dr. Kushner indicated that blood clots are not "permanent"; usually resolve in time with medications in about a month or two; and only "cause problems when they lead to [a] pulmonary embolism."  (R. 58-59).

Because the ALJ heard from a vocational expert at the first hearing, he did not elicit any additional vocational expert testimony.  (R. 62).

## VI. ALJ OPINION

On April 2, 2015, the ALJ determined that the claimant was not disabled under the Social Security Act. The ALJ found the claimant met the insured status requirement of the Social Security Act through March 31, 2013 and had not engaged in substantial gainful activity since March 15, 2011, the alleged onset date of disability. (R. 25).

Next, the ALJ found that the claimant suffered from the severe impairments of migraines, sciatica, osteoarthritis, degenerative joint disease, gastroesophageal reflux disease, spondylosis, carpel tunnel syndrome, deep venous thrombosis, and obesity.  He found that the record contained "no evidence of any other impairment

that had significantly affected the claimant's ability to perform basic work activities." Noting the claimant's left eye blindness, the ALJ found no functional limitations because of this impairment because it caused only "minimal effects" on her ability to work full-time. The ALJ noted that the claimant performed all of her past relevant work with her blind left eye. Citing to Dr. Cox's medical records ruling out any cardiac issue, the ALJ also found no objective medical evidence to support that the claimant had a heart impairment. (R. 26).

Regarding her fibromyalgia, the ALJ found that it was not a medically determinable impairment. The ALJ acknowledged that two doctors diagnosed fibromyalgia through tender point testing under the 1990 ACR Criteria, but gave Dr. Kushner's opinion that the claimant's fibromyalgia was not a medically determinable impairment great weight. The ALJ found that, because the claimant's doctors "failed to properly document the level of force used during those examinations," those diagnoses did not meet the regulation requirements to find that the claimant's fibromyalgia was a medically determinable impairment. (R. 27, 34).

The ALJ acknowledged that the claimant complained of widespread pain throughout the record. But he found that evidence in the record suggests that other disorders could cause the claimant's symptoms, including migraines, sciatica, osteoarthritis, degenerative joint disease, gastroesophageal reflux disease,

spondylosis, carpel tunnel syndrome, and obesity.  Because the claimant's doctors

did not rule out those diagnoses as potential causes of her symptoms, the ALJ

found that the claimant's fibromyalgia is not a medically determinable impairment.

The ALJ next found that none of the claimant's impairments, singly or in

combination, manifested the specific signs and diagnostic findings required by the

Listing of Impairments.  The ALJ took into account the claimant's obesity and its

impact on her ability to function.  (R. 28-29).

The ALJ then determined that the claimant had the RFC to perform light

work, except that she can only occasionally stoop, kneel, crouch, crawl, and climb

ramps and stairs; never be exposed to unprotected heights or dangerous machinery;

never climb ladders, ropes, or scaffolds; and only frequently use her hands

bilaterally to finger and grasp.  In making this RFC determination, the ALJ

indicated that he carefully considered the entire record and thoroughly listed parts

of the record to supports his finding.  The ALJ also stated that his RFC assessment

takes into account all of the claimant's severe impairments.  (R. 29-33, 36).

In considering the claimant's subjective allegations of pain, the ALJ applied

the controlling pain standard of the Eleventh Circuit and found that the claimant's

allegations of pain were not fully credible when considered in light of the entire

record. The ALJ concluded that, although the claimant's medically determinable

impairments could reasonably be expected to cause symptoms, the claimant's

allegations regarding intensity, persistence, and limiting effects of these symptoms were "not entirely credible." He found the "claimant only partially credible because the objective medical evidence of record shows normal findings, which suggest that the claimant's impairments are not as severe as she alleges." He specifically noted the unremarkable imaging of the claimant's spine in March and April 2012; the EMG and nerve conduction tests that showed normal findings; the claimant's minimal reduction in grip strength on the left and right hand; normal straight leg tests on both sides; and normal range of motion in her neck, shoulder, and elbows. (R. 33).

The ALJ also noted that the claimant had a normal gait on some occasions; a negative Romberg test; and ability to walk, squat, and rise. He stated that no doctor has medically prescribed a cane or wheelchair for the claimant. Yet, the ALJ indicated that he accounted for her slightly abnormal gait, obesity, blood clot, and back pain by limiting the claimant's RFC to "occasional postural movements and no exposure to unprotected heights or dangerous machinery." He also stated that he accounted for her carpel tunnel syndrome by limiting her to only frequent use of her hands bilaterally to finger and grasp.

Next, the ALJ gave "weight" to treating physician Dr. Mikul's opinion that she can work because he had the benefit of treating the claimant over an extended period of time and was in the "best position to render an opinion on her condition."

The ALJ gave consulting, non-examining physician Dr. Kushner's opinion that she has no medically determinable impairment at all "less weight" because the claimant has severe impairments that could cause some functional limitations. (R. 34-35).

The ALJ gave consulting, examining physician Dr. Harris' opinion that the claimant could perform only sedentary work little weight because it was "internally inconsistent." The ALJ noted that Dr. Harris' physical examination of the claimant showed fairly normal findings: full range of motion in her neck, shoulders, and neck; negative straight leg test bilaterally; and only slightly reduced grip strength. The ALJ found that Dr. Harris' findings on physical examination were inconsistent with his assessment that the claimant could only sit twenty minutes, stand for fifteen minutes, and walk for fifteen minutes. He also stated that Dr. Harris based much of his opinion on the claimant's subjective allegation that she uses a cane to ambulate and that Dr. Harris' "own physical examination shows that the claimant could walk, squat, and rise." The ALJ noted no doctor in the record prescribed the claimant a cane and that she did not begin using one until 2013. (R. 35-36).

In assessing the claimant's daily activities as they relate to her ability to perform light work, the ALJ noted that she can watch TV; prepare meals for up to one hour; play video games; and dust the house. The ALJ concluded that these

activities show that the claimant can "move around the house and use her hands and feet."

Lastly, the ALJ found that based on his RFC assessment for the claimant and on the vocation expert's testimony at the first hearing, the claimant could perform her past relevant work as a cashier, housekeeper, and presser. Therefore, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was not entitled to disability benefits.

## VII. DISCUSSION

Although the claimant had *two* separate medically acceptable sources who personally examined her and diagnosed fibromyalgia based on a medical finding of at least 12 tender points commonly associated with fibromyalgia, the ALJ found that her fibromyalgia did not constitute a medically determinable impairment. That finding lacks reason and substantial evidence does not support it.

The ALJ based his finding that the claimant's fibromyalgia was not a medically determinable impairment on Dr. Kushner's testimony at the second hearing. The ALJ's reliance on Dr. Kushner's testimony was error. Dr. Kushner indicated early on in the hearing that he had no idea why the ALJ needed the opinion of a rheumatologist because he saw nothing rheumatologically noteworthy in the claimant's medical record. The court has "no idea" why Dr. Kushner was selected to review the claimant's medical records, other than to give a

predetermined opinion of no fibromyalgia. Dr. Kushner made clear that he joins the half of rheumatologists who do not believe that fibromyalgia even exists as a medically determinable impairment. No wonder Dr. Kushner questioned the need for a rheumatologic consultative evaluation for the claimant—he does not think fibromyalgia is "such a thing." He assessed the claimant's fibromyalgia from a biased viewpoint from the beginning of his assessment and incorrectly evaluated the claimant's medical records.

Dr. Kushner's assessments regarding the lack of widespread pain and lack of number of tender points sites tested were contrary to the medical record. Dr. Kushner said he found no evidence in the claimant's medical records to show that her pain was in all quadrants of her body. The record actually shows otherwise. The ALJ even acknowledged that the claimant complained of widespread pain throughout the record. For years, the claimant consistently complained of chronic pain in *all* of her joints all over her body; on the right and left side of her body; in her legs and in her arms; in her shoulders and back; and in her head. The court does not know exactly which records Dr. Kushner reviewed; but the records the court recounted at length in the fact section above constitute substantial evidence that the claimant has widespread pain in all quadrants of her body.

Dr. Kushner also testified about the 1990 ACR Criteria and its requirement that the claimant show at least *11* positive tender points on physical examination.

He stated that he did not "see any numbers in this record" regarding the number of positive tender points for the claimant. Again, Dr. Kushner missed crucial evidence in the record. Even the ALJ pointed out that two of the claimant's doctors diagnosed fibromyalgia based on a finding of *12* positive tender points.

The ALJ even agreed that Dr. Kushner erred when he opined that the claimant had absolutely no medically determinable impairment that would cause any limitation; he gave Dr. Kushner "less weight" as to that unsupported and baseless opinion. Yet, despite Dr. Kushner's failure to correctly assess the claimant's medical records and history and his baseless opinion that the claimant had no medically determinable impairments, the ALJ gave Dr. Kushner's opinion great weight concerning the lack of evidence in the record regarding the amount of pressure the doctors used on the claimant to determine tender points. On that fact alone, Dr. Kushner concluded that those doctors' opinions did not meet the 1990 ACR Criteria to show that the claimant's fibromyalgia was a medically determinable impairment. The ALJ grabbed hold of Dr. Kushner's faulty conclusion and incorrectly made it his own.

Dr. Holdridge, a neurologist who physically examined the claimant, indicated that she used *palpation* to determine at least 12 points of tenderness in the claimant's joints. The Social Security Administration hired Dr. Holdridge to physically examine the claimant and give her medical opinion in the claimant's

disability case. Therefore, the court reasonably assumes that Dr. Holdridge was familiar with the ACR Criteria and the proper force to use upon palpation to determine that the claimant had "at least 12 of the typical fibromyalgia trigger points."

Likewise, the court reasonably assumes that Dr. Mikul, the claimant's treating physician, also knew the proper palpation technique to make a medical finding that the claimant's "Fibromyalgia Tender Point Calculation" was "12." The ALJ gave Dr. Mikul's unexplained opinion that the claimant could work great weight because Dr. Mikul was her treating physician and had the benefit of treating the claimant over an extended period of time. Yet the ALJ refused to afford that great weight to Dr. Mikul's assessment that the claimant had 12 tender points associated with fibromyalgia. The ALJ cannot have it both ways.

Dr. Holdridge and Dr. Mikul's failure to record in their notes that they used "an approximate force of 9 pounds" does not mean they in fact did not use the correct force. If unsure, under SSR 12-2p, the ALJ should have contacted both of these doctors to determine if they used the amount of force required by the regulations. The ALJ also could have ordered a consultative physical *examination* of the claimant by a rheumatologist—one who thinks fibromyalgia actually exists as medically determinable impairment—to determine whether the claimant's fibromyalgia meets either the 1990 or 2010 ACR Criteria. Instead the ALJ ignored

Dr. Holdridge and Dr. Mikul's medical findings based on their failure to specifically *state* the amount of force they used upon palpation. In doing so, he assumed that these doctors—the claimant's treating physician and a Social Security Administration selected examining consultant—did not know how to diagnose fibromyalgia. Discounting their medical opinions solely on this basis was error and substantial evidence does not support the ALJ's finding.

The ALJ also failed to discuss specifically whether the claimant's fibromyalgia met the 2010 ACR Criteria for a medically determinable impairment. The ALJ seemed to acknowledge that the claimant met the widespread pain requirement found in both the 1990 and 2010 Criteria. The ALJ did not address specifically the number of the claimant's fibromyalgia symptoms, signs, and co-concurring conditions. The 2010 Criteria requires at least six or more fibromyalgia symptoms, signs, and co-concurring conditions. The record shows that the claimant had at least *thirteen* fibromyalgia indicators: muscle pain; fatigue; muscle weakness; numbness or tingling; dizziness; insomnia; depression; nausea; chest pain; shortness of breath; hair loss; GERD; and migraines.

The ALJ seemed to ignore these fibromyalgia indicators and instead found that evidence in the record suggests that the claimant's other severe impairments could cause her fibromyalgia symptoms. However, that finding lacks substantial evidence. Dr. Cox could find no cardiac basis for her chest pain or fatigue. Her

nerve conduction test for carpel tunnel syndrome was normal, but Dr. Eslami assessed her carpel tunnel syndrome in one hand despite that normal finding. The May 2010 CT scan of her brain and spinal tap were normal. The January 2013 MRI of her lumbar spine showed normal results and "no abnormality to explain [the claimant's] symptoms." Her diagnosis of degenerative joint disease of the cervical spine at the right facet joint in 2012 does not explain the chronic pain all over her body and fibromyalgia symptoms the years before and after that diagnosis. The objective medical tests throughout the record showed no objective basis or other cause for the claimant's widespread chronic pain *all* over her body.

The ALJ's total disregard for the claimant's fibromyalgia symptoms and diagnoses by Dr. Holdrige and Dr. Mikul without further development of the record is concerning. The court finds that substantial evidence does not support the ALJ's finding that the claimant's fibromyalgia was not a medically determinable impairment.

*Other Concerns*

The court is also concerned that the ALJ failed to include any limitations caused by the claimant's migraines in his RFC assessment. Although the ALJ recounted in his opinion all of the evidence regarding the claimant's migraines and found them to be severe impairments, he failed to explain in any way why he completely disregarded any limitations possibly cause by the claimant's migraines.

In the section of his opinion where he applied the pain standard, he never mentioned the claimant's migraines. On remand, the ALJ should address this concern.

Another concern includes the ALJ's assessment of the claimant's activities of daily living as they relate to her ability to "handl[e] light work" and work a full eight-hour work day. The ALJ found that the claimant could watch TV, prepare meals for up to one hour, play video games, and dust the house. He then concluded that these activities showed that the claimant could "move around and can use her hands and feet." That statement may be true; but all of these activities together do not constitute substantial evidence that she can sustain light work on a full-time basis with her severe impairments. *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (substantial evidence did not support the ALJ's finding that the claimant's ability to do simple household chores negated her claims that she had to lie down every two hours because of her impairments). On remand, the ALJ should explain how these activities of daily living are inconsistent with the claimant's allegations regarding her limitations.

## VIII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence does not support the ALJ's findings regarding the claimant's fibromyalgia.

Therefore, the court REVERSES and REMANDS the decision of the ALJ consistent with this Memorandum Opinion.

The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 20th day of March, 2018.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE